# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JOCCO D. BAILEY,

    **Plaintiff,**

v.

BRANSON ANDREWS,

    **Defendant.**

Case No. 2:16-3201-JAR

## MEMORANDUM & ORDER

Plaintiff Jocco D. Bailey, a Kansas prisoner proceeding *pro se*, brings claims under 42 U.S.C. § 1983, alleging violations of his Eighth and Fourteenth Amendment rights.[1] The Court previously dismissed Defendants Shawnee County Jail, Joe Rucker, Timothy Phelps, and Brian Cole.[2] Plaintiff also brings his claims against Defendant Branson Andrews ("Defendant") in both his individual and official capacity. Before the Court is Defendant's Motion for Summary Judgment (Doc. 31). The motion is fully briefed, and the Court is prepared to rule. As explained fully below, the Court **grants** Defendant's motion for summary judgment.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact

---

[1] At all times relevant to this case, Plaintiff was a pretrial detainee.

[2] Doc. 24.

[3] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[4] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[7]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]

---

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[14] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[15]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

## II. Uncontroverted Facts

Defendants filed a *Martinez* Report.[18] The *Martinez* report is an administrative record, assembled by the prison, that documents the factual investigation of a prisoner's claim.[19] The following facts are uncontroverted, stipulated to in the Pretrial Order, or viewed in the light most favorable to Plaintiff.

Plaintiff was a pretrial detainee at the Shawnee County Jail ("SNDOC") from June 2,

---

[13] *Adams*, 233 F.3d at 1246.

[14] Fed. R. Civ. P. 56(c)(4).

[15] *Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[16] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[18] Doc. 19.

[19] The Tenth Circuit endorsed the use of *Martinez* Reports in *Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978). The Court considers the *Martinez* Report as part of the summary judgment record and treats the report like it would an affidavit. If Plaintiff presents no evidence conflicting with the factual findings contained in the *Martinez* Report, the Court may treat those findings as uncontroverted facts. *Cf. Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992) (explaining that a court cannot accept the factual findings of a *Martinez* Report if the prisoner presents conflicting evidence).

2016 to October 10, 2016. On or about August 12, 2016, Plaintiff entered a guilty plea, and he was sentenced on September 7, 2016. Plaintiff's allegations arise out of a July 22, 2016 altercation between he and another inmate at SNDOC, Clinton Goodwin ("Inmate Goodwin").

In the weeks after Plaintiff was booked into SNDOC, he was screened on several occasions for depression and/or suicidal thoughts, and occasionally placed on "Close Observation" or "Suicide Watch." On July 22, 2016, Plaintiff was housed in SNDOC's K module, which typically houses inmates with special needs or those placed on suicide watch or close observation. If not on lockdown, inmates in the K module are typically free to be in the dayroom amongst all the other inmates. Plaintiff was assigned to cell 1K3, which is located on the lower tier of the module nearest the Officer Workstation where the cell door controls are located. Each cell in the K module can house up to eight inmates at one time in permanent beds. On July 22, 2016, there were eight inmates, including Plaintiff, in cell 1K3.

During the relevant time period, Inmate Goodwin was assigned to cell 1K2 in the K module. Inmate Goodwin served as a Module Worker; he assisted in basic module cleaning responsibilities and other tasks as assigned by staff. Module Workers are "loosely" assigned by the Module Officer and are paid in commissary items. On July 22, 2016, Inmate Goodwin was acting as a Module Worker.

Defendant, who was hired on June 13, 2016 as a Corrections Specialist for SNDOC, was assigned to the Adult Detention Center. As a new hire, Defendant went through one week of orientation and a three-week field training program, which involved a demonstration week, practice week, and test week. He completed approximately 160 hours of training, including an eight-hour demonstration day in the K module. During training, Defendant learned that inmates are not allowed to enter another inmate's cell; this policy is also articulated in SNDOC Policy

4

10-A-11 "Inmate Supervision and Movement." His last day of training was July 8, 2016.

In addition to Inmate Goodwin and another Module Worker performing cleaning tasks in the dayroom, on July 22, 2016, there was a Trusty assigned as a Close Observation Aid to monitor the other inmates within the cells, and two Corrections Specialists—Defendant and C/S Andrew Towle ("C/S Towle"). A Trusty differs from a Module Worker, as Trusties are screened, hired, trained, and paid money to perform a specific job within the facility.

On July 22, 2016, at approximately 7:25 a.m., a SNDOC security video shows a couple of inmates standing at the Officer Workstation, getting ready for lockdown. The Trusty was walking around in a grey jumpsuit, and two Module Workers were cleaning the Module. C/S Towle was sitting by cell 1K1 on suicide watch. The video shows that there were dirty socks outside cell 1K3.

At approximately 7:27:40 a.m., Inmate Goodwin approached the 1K3 cell door and called out to Defendant "Hey can you open the door to (*indiscernible*) real quick."[20] Inmate Goodwin then stated, "Na, I'm being serious. I'm not going to keep picking up the dirty ass socks."[21] Inmate Jordan Seymour testified in an affidavit, included in the *Martinez* Report, that he heard Inmate Goodwin ask Defendant "to open up cell 1K3 so he could fuck up whoever threw a pair of dirty socks on the floor."[22] Defendant believed that Inmate Goodwin was going to return the socks that were on the floor outside cell 1K3 to one of the inmates in cell 1K3.[23] Defendant stated during the *Martinez* Report investigation that if Inmate Goodwin had been making threats

---

[20] Doc. 19-17 at "Leftside" 7:27:40–48 a.m.

[21] *Id.*

[22] Doc. 19-20 at 1.

[23] Doc. 19-17.

5

he would not have opened the door to cell 1K3.[24]

The video shows that a few seconds after Inmate Goodwin called out to open the cell door, Defendant unlocked the 1K3 cell door from the Officer Workstation controls, and Inmate Goodwin opened the door to cell 1K3 and stood in the doorway, leaning into the cell. Inmate Goodwin then hollered at the inmates in the cell, "I'm only gonna say this one time bitch. Whoever's dirty socks these are put them by the fucking (*indiscernible*)."[25] Inmate Goodwin then turned around and walked away from the cell door as it started to close behind him. Plaintiff and the other 1K3 cellmates remained inside cell 1K3.

Prior to the cell door closing, Plaintiff approached the door, reopened it, leaned out of the cell while holding the door open and yelled at Inmate Goodwin, "Hey (*indiscernible*)."[26] Inmate Goodwin turned and began to enter the janitor's closet next to cell 1K3. Instead of entering the janitor's closet, Inmate Goodwin approached Plaintiff, who remained in the doorway, and the two began shouting at each other. Inmate Goodwin stated, "No I don't know who it was," to which Plaintiff replied, "I just fucking told you who it was."[27] Defendant interjected, "Hey, walk back."[28] Inmate Goodwin then stated, "You got a problem," and Plaintiff responded, "Yea bitch."[29] Inmate Goodwin grabbed Plaintiff and shoved him to the ground, and the two began fighting. Defendant reacted by yelling, "Get off of him, get off of him. Break it up now."[30] He

---

[24] Doc. 19-8.

[25] Doc. 19-17 at "Leftside" 7:27:58 a.m.

[26] *Id.* at "Leftside" 7:28:10 a.m.

[27] *Id.* at "Leftside" 7:26:16–7:28:18 a.m.

[28] *Id.*

[29] *Id.* at "Leftside" 7:28:23–7:28:25 a.m.

[30] *Id.* at "Leftside" 7:28:28–7:28:50 a.m.

walked around the module, pointing his finger as if directing others to take action.[31] He also talked on his radio and yelled at other inmates to shut their cell doors.[32] Other Corrections Specialists quickly entered the area, subdued and handcuffed the inmates, and removed them one at a time from the module.[33]

After the altercation, Plaintiff was taken to the Medical Module for a checkup, and then transferred from the K Module to the Segregation Module. On July 23, 2016, the medical staff examined Plaintiff during medical rounds in the Segregation Module. Plaintiff reported a bite mark to his right upper quadrant. The bite appeared to be a human bite, with bruising and possible open areas. Plaintiff mentioned other injuries on his Inmate Request to Staff Forms, but never as a request for medical assistance. For example, on a July 31, 2016 request to the Law Library, Plaintiff stated he had serious bodily harm, including "busted head, slight concussion and a bite on my stomach."[34] On August 9, 2016, in a request to Records, Plaintiff stated he had a "swollen knot on the back of my head (after being slammed to the floor . . .) causing me *dizzy* spells and the severe right pain in my right shoulder/arm. Persistent pain."[35]

To assess Inmate Goodwin's and Plaintiff's actions, Sergeant Randles, the Disciplinary Hearing Officer, conducted both an internal disciplinary investigation and due process hearing. After reviewing video, Randles determined that Plaintiff appeared to be acting in self-defense to protect himself from Inmate Goodwin's punches and biting and dismissed the case against Plaintiff. Accordingly, Inmate Goodwin was sanctioned with thirty days of disciplinary

---

[31] *Id.*

[32] *Id.*

[33] *Id.* at "Leftside" 7:29:00 a.m.

[34] Doc. 19-25.

[35] *Id.*

segregation.  Randles explained that finding Plaintiff not guilty of the fight was a "judgment call."[36]  He indicated that Inmate Goodwin appeared to initiate the physical conduct and that Plaintiff did not appear to throw punches, but rather tried to keep Inmate Goodwin at bay.  Prior to the July 22, 2016 altercation, there were no complaints on record from Plaintiff regarding Inmate Goodwin.  Similarly, there were no complaints from Inmate Goodwin about Plaintiff.  There were also no orders to keep Plaintiff away from any of the inmates in the K Module for his safety or any other reason prior to the July 22, 2016 altercation.

On August 29, 2016, Plaintiff filed an emergency grievance regarding the altercation between himself and Inmate Goodwin.  On the same day, Defendant formally resigned from his position, effective immediately, citing "personal issues."[37]

## III. Discussion

Plaintiff asserts that he is entitled to relief pursuant to 42 U.S.C. § 1983, alleging that Defendant failed to protect him in violation of his Eighth and/or Fourteenth Amendment rights.  Defendant argues that summary judgment is warranted because there are no disputed issues of material fact and Plaintiff cannot demonstrate that Defendant violated his constitutional rights.  With respect to the claims against Defendant in his *individual* capacity, Defendant also asserts that he is entitled to qualified immunity.

For individual capacity claims, qualified immunity provides government officials breathing room to make reasonable but mistaken judgments about open legal questions.[38]  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have

---

[36] Doc. 19-8 at 4.

[37] Doc. 19-31.

[38] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

8

known.'"[39] To this end, qualified immunity protects officials from liability unless the plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right violated was 'clearly established' at the time of the challenged conduct."[40] It is within the Court's discretion which of the two prongs of the analysis to address first.[41] Only if the plaintiff clears these hurdles does the burden shift back to the defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[42]

In determining whether the plaintiff has demonstrated a violation of his constitutional or statutory rights and that the right was clearly established at the time, the Court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment.[43] In *Scott v. Harris*, the United States Supreme Court held that "this usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[44] Moreover, the Tenth Circuit has held that "because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record."[45] In that sense, the Court does not discard the Rule 56 process but relies upon facts supported by the record, while viewing those facts and reasonable inferences therefrom in the light most favorable to Plaintiff.

---

[39] *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curium)).

[40] *al-Kidd*, 563 U.S. at 735 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[41] *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[42] *Rojas v. Anderson*, 727 F.3d 1003, 1003–04 (10th Cir. 2014).

[43] *Scott v. Harris*, 550 U.S. 372, 376–80 (2007).

[44] *Id.*

[45] *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (quoting *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)).

### A. Violation of a Constitutional Right

Defendant is entitled to summary judgment on *both* the official and individual capacity claims because Plaintiff cannot show that he violated a constitutionally protected right.

#### 1. Failure to Protect Under the Eighth Amendment

Plaintiff cannot bring his failure to protect claims under the Eighth Amendment. The Eighth Amendment has historically been interpreted to protect those convicted of crimes.[46] It is uncontroverted that Plaintiff was a pretrial detainee at the times relevant to this litigation.

> The rights of pretrial detainees, "those persons who have been charged with a crime but who have not yet been tried on the charge," are not controlled by the cruel and unusual punishment clause of the Eighth Amendment because the Fifth and Fourteenth Amendments prohibit punishment "prior to an adjudication of guilt in accordance with due process of law."[47]

Therefore, Plaintiff's status of a pretrial detainee precludes him from bringing his claims under the Eighth Amendment,[48] and summary judgment is granted in favor of Defendant on Plaintiff's Eighth Amendment claims.

#### 2. Failure to Protect Under the Fourteenth Amendment

Plaintiff additionally raises Fourteenth Amendment Due Process claims based on Defendant's alleged failure to protect in deliberate indifference. The Due Process Clause of the Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."[49] In the Tenth Circuit, a pretrial detainee's Due Process

---

[46] *Ingraham v. Wright*, 430 U.S. 651, 664–67 (1977); *see McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996) (noting that pretrial detainees are protected by the Due Process Clause, and convicted persons are protected by the Eighth Amendment).

[47] *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

[48] *See Youngberg v. Romeo*, 457 U.S. 307, 311–17, 324 (1982) ("We conclude that the jury was erroneously instructed on the assumption that the proper standard of liability was that of the Eighth Amendment.").

[49] U.S. Const. amend. XIV, § 1.

rights "parallel that of an inmate's Eighth Amendment rights[.]"[50] "Conduct that violates the clearly established rights of convicts necessarily violates the clearly established rights of pretrial detainees."[51] Thus, while Plaintiff's failure protect claims arise under the Fourteenth Amendment, the Eighth Amendment provides the standard for analyzing the claims.[52]

A prisoner has a constitutional right under the Eighth Amendment to humane conditions of confinement, which requires prison officials to provide "adequate food, clothing, shelter, and medical care;" and to "take reasonable measures to guarantee the safety of the inmates."[53] "In particular, inmates have a 'constitutional right to be reasonably protected from constant threats of violence and sexual assaults from other inmates.'"[54] To prevail on a failure to protect claim, an inmate must show a prison official's deliberate indifference to "conditions posing a substantial risk of serious harm."[55] Thus, the analysis contains both an objective and a subjective component.[56] First, "[t]he objective component requires conditions sufficiently serious so as to 'deprive inmates of the minimal civilized measure of life's necessities.'"[57] Second, the subjective component requires a defendant prison official to "have a culpable state of mind, that he or she acts or fails to act with deliberate indifference to inmate health and safety."[58]

---

[50] *Glover v. Gartman*, 899 F. Supp. 2d 1115, 1133 (D. N.M. 2012) (citing *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).

[51] *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013).

[52] *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.6 (1979) and *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)).

[53] *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotations omitted) (citation omitted).

[54] *Savage v. Fallin*, 663 F. App'x 588, 592 (10th Cir. 2016) (quoting *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980)).

[55] *Farmer*, 511 U.S. at 834–35 (citation omitted).

[56] *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001).

[57] *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

[58] *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 303 (1991)).

### i. Objective Component: Substantial Risk of Serious Harm

To satisfy the standard for the objective component of a failure to protect claim, the plaintiff bears the burden of "produc[ing] objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"[59] The objective component requires an extreme deprivation,[60] and "[o]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."[61] Therefore, the plaintiff "must show that conditions were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety."[62]

According to Plaintiff, the serious risk arose when Defendant unlocked the 1K3 cell door, which allowed Inmate Goodwin to enter cell 1K3, start shouting about the socks outside the door and allegedly make threats. Plaintiff argues that after this encounter, Defendant had a duty to intervene to protect Plaintiff from a substantial risk of serious harm, and that Defendant "disregarded the risk by failing to act reasonably to avoid it."[63] Defendant responds that the Eighth Amendment's duty to protect is not triggered by a fight that Plaintiff willingly encountered and could have prevented.[64]

The undisputed facts show that Plaintiff engaged in a voluntary encounter with Inmate Goodwin, resulting in the altercation. Prior to the altercation, Defendant unlocked the door to cell 1K3 at Inmate Goodwin's request. The altercation between Plaintiff and Inmate Goodwin, however, did not occur until after Inmate Goodwin shouted his grievances about the socks

---

[59] *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834).

[60] *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations omitted).

[61] *Covalt v. Inmate Servs. Corp.*, 658 F. App'x 367, 369 (10th Cir. 2016) (quoting *Wilson*, 501 U.S. at 298).

[62] *DeSpain v. Uphoft*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834).

[63] Doc. 34 at 9.

[64] Doc. 32 at 11.

outside the cell, let the cell door start to close, and began walking away from the cell. Prior to the cell door closing, Plaintiff reopened it and began yelling at Goodwin. After a brief, albeit heated exchange, Inmate Goodwin grabbed Plaintiff and shoved him to the ground. Defendant subsequently responded to the altercation. Viewing these facts in a light most favorable to Plaintiff, a reasonable jury could not infer that Plaintiff faced a substantial risk of serious harm when Defendant unlocked the cell door to 1K3. It is clear that the risk arose from Plaintiff stepping outside and engaging with Inmate Goodwin, not from Defendant unlocking the cell door. Accordingly, summary judgment in favor of Defendant is warranted because Plaintiff cannot show that the conditions created by Defendant posed a substantial risk of serious harm.

### ii. Subjective Component: Deliberate Indifference Toward Risk of Serious Harm

Even if a reasonable jury could infer the existence of a substantial risk of serious harm, Plaintiff does not point to evidence on the record that establishes Defendant acted with deliberate indifference. Whether the standard for deliberate indifference is satisfied requires an "inquiry into a prison official's state of mind."[65] To satisfy the subjective component of deliberate indifference, a plaintiff must show (1) that the prison official knew "of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) that the prison official drew the inference.[66] A prison official's failure "to alleviate a significant risk that he should have perceived but did not," is not enough to satisfy this requirement.[67] A plaintiff may prove actual knowledge of a substantial risk "in the usual ways," and "a factfinder may infer

---

[65] *Farmer*, 511 U.S. at 838 (quoting *Wilson*, 501 U.S at 299).

[66] *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting *Craig v. Eberly*, 164 F.3d 490, 495 (1998)).

[67] *Farmer*, 511 U.S. at 837–38.

actual knowledge through circumstantial evidence, or 'may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious.'"[68]

Plaintiff alleges that Defendant was deliberately indifferent. First, Plaintiff asserts that Inmate Goodwin's alleged threats of "fucking someone up" because of the dirty socks outside cell 1K3 allows a jury to infer that Defendant knew of a substantial risk of harm. While the entirety of Inmate Goodwin's comments regarding the socks is unclear from the SNDOC surveillance video, even viewing the facts in a light most favorable to Plaintiff, these comments are not sufficient to lead to an inference of a substantial risk of harm at Plaintiff because the comments are not specific or obvious threats directed to Plaintiff.[69] Moreover, "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm."[70] Here, the circumstances are not so severe as to impute actual knowledge of a substantial risk of harm.

Plaintiff argues that the circumstantial evidence demonstrates that Defendant must have known about the substantial and obvious risk of danger to Plaintiff. This contention, however, is contrary to the record. The undisputed facts from the surveillance video show that during Inmate Goodwin's initial verbal exchange with the inmates in cell 1K3, there was no physical violence, he did not direct his words to a specific individual, and he walked away and let the door begin to

---

[68] *Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1196 (D. Kan. 2008) (quoting *Farmer*, 511 U.S. at 842).

[69] *See Brown v. Dorneker*, No. CIV.A.06-3245-CM, 2008 WL 3334025, at *5 (D. Kan. Aug. 8, 2008) ("Without citing to the record, plaintiff alleges that when defendant Swift told Mr. Jackson to go back to cell 5, Mr. Jackson told her that someone will get 'fucked up.' Even if true, this exchange does not raise to the level of an obvious and specific threat.").

[70] *Ruiz v. Clifton*, No. 13-3045, 2014 WL 5321092, at *4 (D. Kan. Oct. 16, 2014) (citing *Prater v. Dahm*, 89 F.3d 538, 541–42 (8th Cir. 1996)). *But cf. Young v. Garfield Cty.*, No. CIV-06-146-D, 2008 WL 4525469, at *2 (W.D. Okla. 2008), *appeal dismissed and remanded*, 329 F. App'x 846 (10th Cir. 2009) (finding that a reasonable jury could infer that the defendants knew the plaintiff was at risk of retribution from his attacker when the plaintiff had disclosed in a grievance that his attacker was attempting to extort money in exchange for the addresses of his family and friends and that he viewed his attacker's demand as a "veiled threat" to not discuss the matter with anyone).

close.  Defendant's belief that Inmate Goodwin wanted to return the dirty socks to an inmate in cell 1K3 does not lead to an inference that a fight would occur, even if an inference is drawn that Inmate Goodwin also wanted to confront the inmates about leaving dirty socks outside the cell. The undisputed facts show that Plaintiff and Inmate Goodwin had no history of hostility toward each other, as neither had complained about the other nor had any past altercations, and both were permitted to be free in the dayroom with the other inmates if not on lockdown.[71]  While Plaintiff contends he exited his cell to vocalize his concerns about what he perceived as threats from Inmate Goodwin, this is unsupported by the record as the surveillance video shows Plaintiff confronting Inmate Goodwin, not attempting to ask Defendant for help or protection.  Moreover, the physical violence did not occur until after Plaintiff prevented the 1K3 cell door from closing, stepped outside the cell, and engaged Inmate Goodwin.

Plaintiff also asserts that Defendant was deliberately indifferent because the cell doors did not automatically lock, meaning he was not out of danger from Inmate Goodwin when the cell door closed.[72]  This has no bearing on Defendant's deliberate indifference, however, because this information is not found in the record,[73] and moreover, the uncontroverted facts show that Plaintiff prevented the door from shutting when he exited his cell and confronted Inmate Goodwin.

Accordingly, a reasonable jury could not infer that Defendant knew that Inmate Goodwin posed a substantial risk of harm to Plaintiff.  Defendant is thus also entitled to summary

---

[71] *See Ruiz*, 2014 WL 5321092 at *4 (finding that the circumstances did not support an inference that the defendant was "subjectively aware that a verbal altercation . . . would later lead to a physical fight" when the plaintiff and his attacker had no history of animosity with each other, the defendant did not have a violent history at the facility, and the plaintiff did not require protective custody).

[72] Doc. 34 at 11.

[73] Similarly, Plaintiff's contention that the mop closet is to remain locked is missing from the record.

judgment because Plaintiff cannot establish the subjective component of the alleged violation of his constitutional rights.

B. **Qualified Immunity on Individual Capacity Claims**

A previously discussed, even viewing the facts in a light most favorable to Plaintiff, Plaintiff fails to establish that Defendant violated a constitutional right. With respect to the *individual* capacity claims, the Court grants summary judgment in favor of Defendant based on Plaintiff's inability to establish the first prong needed to avoid qualified immunity—Defendant's violation of a constitutional right. Defendant asserts that qualified immunity is also appropriate because Plaintiff cannot show Defendant violated a right that was clearly established at the time of the alleged violation.

A constitutional right is clearly established for the purposes of qualified immunity if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[74] Generally, for a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[75]

Plaintiff points the Court to *Hostetler v. Green*, a Tenth Circuit decision, to show that Defendant violated clearly established law.[76] However, the Court finds that the facts in *Hostetler* differ greatly from the present case, and thus, *Hostetler* cannot support Plaintiff's assertion that Defendant violated clearly established law. In *Hostetler*, a female inmate alleged that a jailer acted with deliberate indifference to her safety by failing to protect her from sexual assault by

---

[74] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

[75] *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quoting *Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010)).

[76] *Hostetler v. Green*, 323 F. App'x 653 (10th Cir. 2009).

another inmate.[77] The plaintiff alleged the jailer allowed a male inmate into the her cell in violation of a policy not allowing male inmates in female cells to prevent sexual assault, and the male inmate subsequently raped her.[78] The jailer told the male inmate several times to leave the cell, but he failed to comply.[79] In response, the jailer shut and locked the plaintiff's cell door, and the plaintiff and the male inmate remained inside the locked cell for up to ten minutes.[80] Based on these facts, the Tenth Circuit concluded that the jailer's violation of the policy, his awareness of its rational, and his knowledge that he violated the policy supported an inference that he was aware of the plaintiff's increased risk of sexual assault when he violated the policy.[81] The court explained that the jailer's action violated clearly established law as "[t]he Supreme Court and the Tenth Circuit have repeatedly and unequivocally established an inmate's Eighth Amendment right to be protected from substantial risks of sexual assault by fellow prisoners."[82]

Plaintiff asserts that Defendant violated SNDOC Policy 10-A-11, which prohibits inmates from entering another inmate's assigned cell. As the Tenth Circuit explained in *Hostetler*, "a failure to adhere to administrative regulations does not equate to a constitutional violation."[83] Unlike in *Hostetler*, the record here does not suggest that Policy 10-A-11 was designed to prevent what led to the altercation between Plaintiff and Inmate Goodwin, namely, an inmate preventing their cell door from closing, exiting their cell, and then engaging in a conversation that escalated into a physical altercation with another inmate who had previously

---

[77] *Id.* at 654.

[78] *Id.* at 655.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 658.

[82] *Id.* at 659 (alteration in original) (quoting *Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008)).

[83] *Id.* at 657–58 (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)).

entered the cell.  Accordingly, Plaintiff fails to show that Defendant violated a clearly established right at the time of the alleged violation, and Defendant is entitled to summary judgment as to the individual capacity claims based on qualified immunity.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 31) is **granted**.  Plaintiff's case is hereby dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

Dated: April 29, 2019

s/  Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE